# In the United States Court of Federal Claims

No. 13-403C
Filed: October 31, 2013
Reissued: December 3, 2013[1]

* * * * * * * * * * * * * * * * * * *

COLONIAL PRESS INTERNATIONAL,
INC.,

                Plaintiff,

        v.

UNITED STATES,

                Defendant.

\* **Post-Award Bid Protest; Government**
\* **Printing Office; Statutory**
\* **Construction; Responsibility**
\* **Determination; Small Business**
\* **Administration Certificate of**
\* **Competency Program.**

* * * * * * * * * * * * * * * * * * *

**Anthony W. Hawks**, Hawks Law Office, Bethany Beach, D.E., for the plaintiff. **Philip H. Hecht,** Law Office of Philip H. Hecht, Washington, D.C., of counsel.

**J. Byran Warnock**, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for the defendant. With him were **Bryant G. Snee**, Acting Director, Commercial Litigation Branch, and **Stuart F. Delery**, Assistant Attorney General, Civil Division, Washington, D.C. **Roy Potter**, Associate General Counsel, United States Government Printing Office, Washington, D.C., of counsel.

## O P I N I O N

**HORN, J.**

Plaintiff, Colonial Press International, Inc. (Colonial Press), filed a post-award bid protest in this court, challenging the United States Government Printing Office (GPO) award of a contract under a United States Department of Health and Human Services (HHS) initiative known as Program 199-S to Fry Communications, Inc. (Fry Communications).[2] Plaintiff alleges that, "[a]s the actual low responsive bidder on the GPO Program 199-S contract, Colonial Press would have received the award but for the

---

[1] This opinion was issued under seal on October 31, 2013. The parties were given the opportunity to propose possible redactions, but no redactions were proposed. The original opinion is hereby unsealed and reissued without redactions.

[2] Fry Communications did not intervene in the above captioned protest.

non-responsibility determination and thus has an obvious direct economic interest in the award having been made to Fry Communications." Colonial Press argues that the GPO Contracting Officer's determination of plaintiff's nonresponsibility for the purposes of the 199-S contract was arbitrary, capricious, and lacked a rational basis. Plaintiff seeks an injunction with instructions from this court that the GPO correct the alleged errors in its nonresponsibility determination process and re-evaluate the responsibility determination made with respect to Colonial Press. Colonial Press also seeks an injunction precluding the GPO from ordering work for Program 199-S from Fry Communications, the awardee of the 199-S contract.

## FINDINGS OF FACT

On June 26, 2012, the Department of Health and Human Services – Centers for Medicare and Medicaid Services (DHHS-CMS) submitted a requisition for Program 199-S to the GPO. Subsequently, the GPO issued an invitation for bids under Program 199-S in order to complete a printing order for DHHS-CMS. Program 199-S involved the "production of 63 versions of English and Spanish separate-covered, perfect bound publications," titled in English, "Medicare and You," and in Spanish, "Medicare y Usted," respectively, with the possibility that the number of versions could increase from year to year. The invitation for bids was for a contract with a term beginning on the "Date of Award" and ending on January 31, 2014, with four optional twelve month extension periods. The product quality levels required for the books to be produced under the contract varied, with Quality Level II required for the printing and finishing of the covers, and Quality Level III required for the printing and finishing of the text pages.[3] The invitation for bids specified that orders under the 199-S contract would consist of approximately twelve orders throughout the year, usually on a monthly basis, with approximately 300,000 total orders estimated per month. Each order would consist of approximately 275,000 to 375,000 copies in English, and approximately 3,500 to 4,000 copies in Spanish. Although, generally, orders would be placed monthly, according to the invitation for bids, there was potential for months when no orders would be placed, and for orders requesting up to a three months order at a time. The solicitation also included the possibility of supplemental bulk copy orders. The GPO amended the invitation for bids twice, once on January 28, 2013 and again on January 30, 2013, in order to make minor changes to the specified standards, the binding instructions, and the lists of qualified paper.[4]

---

[3] GPO Publication 310.1, effective May 1979, and revised August 2002, titled: "GPO Contract Terms Quality Assurance Through Attributes Program for Printing and Binding," explains that there are five quality levels, and that "[t]hese levels range from Best Quality [highest quality, tightest tolerances] (Level I) through Functional Quality [lowest usable quality, greatest tolerances] (Level V), allowing successively more deviation from design characteristics and furnished reproducibles." See GPO Publication 310.1, available at www.gpo.gov/pdfs/vendors/qatap.pdf.

[4] None of the amendments are at issue in this protest.

2

Bids for the 199-S solicitation could be submitted beginning February 4, 2013 and plaintiff submitted its bid on that day. In addition to the bid submitted by Colonial Press, the GPO received eight other bids in response to the invitation for bids. The nine offerors[5] were as follows:

| Bidders | Non-Discounted Bid | Discounted Bid[6] |
|---|---|---|
| Colonial Press | $2,442,872.26 | $2,418,443.54 |
| Fry Communications | $2,553,617.40 | $2,502,545.05 |
| NPC, Inc. | $2,510,716.20 | $2,504,439.41 |
| Publishers Press | $2,651,591.84 | $2,519,012.25 |
| Gateway Press, Inc. | $2,637,452.16 | $2,558,328.60 |
| Bind-Rite Robbinsville | $2,626,813.80 | $2,574,277.52 |
| R.R. Donnelly & Sons, Inc. Dba Von Hoffman | $2,599,581.80 | $2,599,581.80 |
| Brown Printing Company | $4,282,202.92 | $4,068,092.77 |
| The D.B. Hess Company | $7,302,687.84 | $7,302,687.84 |

Colonial Press was the low bidder in response to the invitation for bids for the 199-S contract, with a discounted bid of $2,418,443.54. Fry Communications was the second lowest bidder, with a discounted bid of $2,502,545.05.

The GPO followed the protocols set forth in its Printing Procurement Regulation (PPR), found in GPO Publication 305.3 (Rev. 2-11),[7] when it solicited and evaluated the bids for the 199-S contract. The PPR addresses the printing procurements for the

---

[5] The information on the first four bidders comes from the Contract Review Board Memo. The information for the remaining five bidders comes from the Colonial Press' protest to the United States Government Accountability Office (GAO), and from the complaint filed in this court.

[6] Discounted Bid refers to the amount of a bid after the application of a Prompt Payment Act discount. The value of the discount varied between bid proposals. Colonial Press offered a one percent discount for payment in twenty calendar days.

[7] The PPR is available online at http://www.gpo.gov/pdfs/vendors/sfas/ppr.pdf.

GPO's federal agency clients, and "is issued to: (i) prescribe uniform policies and procedures for the procurement of printing, binding, related supplies, and related services; and, (ii) provide guidance to Agency Publishing Services (APS) personnel in applying those policies and procedures." PPR, Chapter I, §§ 1.1, 1.3. Chapter XII of the PPR, "Certification and Award," governs the certification and evaluation of bid responses received by the GPO in response to invitations for bids. Section 1.1 of Chapter XII states:

> After opening and abstracting bids, Printing Services Specialists shall evaluate all responses to determine the lowest responsive bid, the responsibility of the low responsive bidder, and whether the price bid is fair and reasonable to the Government.

PPR, Chapter XII, § 1.1.

With respect to a contractor's "responsibility," the PPR at Chapter I, § 5.4 sets forth minimum standards that a prospective contractor must meet in order to receive a favorable responsibility determination:

> To receive a favorable responsibility rating, a prospective contractor must meet the standards set forth below to the extent applicable to the specific procurement. The prospective contractor shall:
>
> (a) Have adequate financial resources, or the ability to obtain adequate financial resources to perform the contract;
>
> (b) be able to comply with the proposed delivery schedules, taking into consideration other existing commitments, commercial as well as governmental;
>
> (c) have a satisfactory record of performance in regard to both quality and timeliness on previously awarded contracts;
>
> (d) possess, or have the ability to acquire, the necessary equipment, technical skills, and productive capacity to perform the contract requirement. [sic]
>
> (e) have adequate production controls and quality assurance methods to satisfy the quality requirements of the contract;
>
> (f) be able to satisfy any specified special standards of responsibility. Such special standards may be incorporated in specifications where the requirements call for unusual expertise, specialized facilities, or location of facilities; and

4

(g) be otherwise qualified and eligible to receive an award under applicable laws and regulations.

PPR, Chapter I, § 5.4. According to Chapter I, § 5.5: "A Contracting Officer, prior to making an affirmative responsibility determination, shall be satisfied that the available information sufficiently demonstrates that the prospective contractor meets the minimum standards set forth in subsection 4."

In accordance with the PPR, upon receipt of the bid from Colonial Press, the GPO reviewed the compliance history of Colonial Press with respect to past GPO contracts. A GPO Printing Specialist, Marty Janney, prepared a summary, one-page "PREAWARD SURVEY" relevant to Colonial Press' responsibility, including information on the contractor's performance history, quality history, quality samples, program history, correspondence history, and investigation factors. In the summary, the GPO identified Colonial Press as satisfactory in the eleven following factors: mechanical capability; plant facilities and equipment; purchasing; transportation; labor resource; ability to meet schedule; production capability; financial capability; quality assurance capability; security clearance; and performance record. The only qualifying comment in the Preaward Survey was that "CONTRACTOR HAS NOT PROVEN THE ABILITY TO MATCH PROOFS ON WEB PRINTING – LEVEL 2 IS FOR SHEETED ONLY . . . ."

Included with the Preaward Survey was the backup support for the summary in the form of the "CONTRACTOR PERFORMANCE HISTORY – PRIOR 13 MONTHS TO PRESENT," in which the GPO developed a "contractor performance history" for Colonial Press covering the prior thirteen months, on a month by month basis from February 2012 to February 2013.[8] The Contractor Performance History included a chart of the total jobs performed as well as the number of late deliveries by Colonial Press over the prior month, the prior three months, the prior twelve months, and the prior twelve months with the addition of the then current month. The Contractor Performance History also provided the percentage of late deliveries out of the total number of deliveries for the prior month, prior three months, and prior twelve months periods, rounded to the nearest whole number. Over the thirteen-month period identified in the Contractor Performance History, out of 117 orders, Colonial Press was late on seven deliveries, or late on just under 6% of the deliveries. During November 2012, December 2012, and January 2013, the three months prior to the date of the solicitation for the 199-S contract, Colonial Press' late delivery record, three late deliveries in November 2012, zero late deliveries for December 2012, and zero late deliveries for January 2013,

---

[8] There is an inconsistency in the number of deliveries by Colonial Press between November 2012 and February 2013. The Preaward Survey stated that eighteen orders were completed, between November 2012 and February 2013, with nine deliveries in November 2012, five deliveries in December 2012, three deliveries in January 2013, and one delivery in February 2013. The supporting documentation in the Contractor Performance History, however, described seventeen orders completed from November 2012 to February 2013, with nine deliveries in November 2012, five deliveries in December 2012, two deliveries in January 2012, and one delivery in February 2013.

resulted in a late delivery rate of 18%. For November 2012, specifically, Colonial Press' late delivery rate was 33%. During the month of February 2013, Colonial Press had no late deliveries. The information in Colonial Press' Preaward Survey stated:

| PERFORMANCE HISTORY | **** | JOBS | LATE | % |
|---|---|---|---|---|
| CURRENT MONTH | FEB | 1 | 0 | 0 |
| PREV 3 MONTHS | JAN | 3 | 0 | 0 |
| | DEC | 5 | 0 | 0 |
| | NOV | 9 | 3 | 33 |
| 3 MONTH TOTALS | | 17 | 3 | 18 |
| PRIOR 12 MONTH TOTALS | | 117 | 7 | 6 |
| PRIOR 12 & CURRENT[9] | | SC 0 | DEFAULT 0 | PROG DEFAULT 0 |

The Preaward Survey created for Fry Communications, the winning bidder with the second lowest bid for the 199-S contract, similarly summarized Fry Communications' performance history. Over the prior thirteen months, Fry Communications had no late deliveries. The information in Fry Communications' Preaward Survey stated:

| PERFORMANCE HISTORY | **** | JOBS | LATE | % |
|---|---|---|---|---|
| CURRENT MONTH | FEB | 0 | 0 | 0 |
| PREV 3 MONTHS | JAN | 2 | 0 | 0 |
| | DEC | 1 | 0 | 0 |
| | NOV | 2 | 0 | 0 |
| 3 MONTH TOTALS | | 5 | 0 | 0 |
| PRIOR 12 MONTH TOTALS | | 32 | 0 | 0 |
| PRIOR 12 & CURRENT[10] | | SC 0 | DEFAULT 0 | PROG DEFAULT 0 |

---

[9] Information in chart as in original.

[10] Information in chart as in original.

6

While preparing the Preaward Survey for Colonial Press, GPO Printing Specialist Janney contacted Colonial Press by email on February 12, 2013 to request "a brief explanation of the causes for these late deliveries and of any corrective measures that may have been taken to avoid such delays in the future." Mr. Janney emphasized the importance of timely deliveries for the 199-S contract, stating:

> The Medicare Handbook is a critical and high volume monthly publication. The customer agency has mandatory regulatory requirements that require timely delivery of the monthly print orders. Because of these critical requirements we are being very cognizant of potential contractors' overall compliance history for the last 12 months.

Chris Sergua, Contract Manager of Colonial Press, responded the same day, February 12, 2013, with explanations for plaintiff's seven late deliveries. Mr. Sergua's response, in relevant part, stated:

> We have an extensive track record with time sensitive, critical, term contract projects. Our on time delivery record with these types of projects is spotless. As confirm [sic] in our most recent 13-month compliance report, we had 100% compliance on 71 print orders.
>
> With regard to the one time bids and small purchase jackets during this period, the brief explanation of the causes and remedies for the jackets mentioned in your email are as follows:
>
> **Jacket 374-797**
>
> Explanation: The jacket required a partial delivery to arrive by 5/25/12 and complete shipment by 6/15/12. We shipped the partial on 5/21/12 expecting the material to arrive in Colorado on or before 5/25/12. The shipper phoned 24 hours in advance to schedule an appointment as required by the contract and learned that the consignee was not available on the 25th. The shipment was re-scheduled for delivery on the 29th and was in fact delivered on the 29th. The final shipment was received at the consignee on time on 6/15/12.
>
> Corrective Action: We have modified our in-process shipment tracking method to include daily status for all GPO jobs in transit.
>
> **Jacket 374-351**
>
> Explanation: The proof was received by the Agency on 3/30/12. The proof was held for 5 months and returned on 8/10/12. We requested a modification for a new delivery date of 8/28/12. The job delivered on 8/24/12. The modification we received was in error and only extended the

7

delivery date to 8/21/12. We requested a new modification to correct the deliver [sic] date but as of today we have not been granted the request.

Corrective Action: We will follow up with the administrator to correct the compliance report.

**Jacket 536-193 and 194**

Explanation: The jackets required a partial shipment to arrive on 9/21/12 with a complete shipment on 9/28/12. The partial arrived on time but upon inspection, a sequencing error was found in the first 2 pallets. We agreed to inspect and correct the first 2 pallets. The balance of the order did not have a sequencing error and was in transit to be delivered on 9/28/12. While the partial was in transit back to our plant, and the complete order was in transit to arrive on or before 9/28/12, we received a call from GPO stating the Agency wanted to change the specifications and renumber the entire order. The renumbering required unpacking, moving one book in each package to the other package, and then repacking. We had to redo the packaging on the entire order due to a specification change. Although we have requested a modification for a revised delivery date numerous times, we have never been granted delivery relief for the job.

Corrective Action: As this was a major specification change requested by the Agency, we do not feel any corrective action in our order processing was required. As an anecdotal comment, the Agency came to inspect our work process and was very pleased with our performance on this contract. They commented that the previous vendor took 6 months to complete the project and upon completion there was a major quality error with the item.

**Jacket 376-169**

Explanation: The print files were supposed to be available for pick up on 11/8/12. The files were available for pick up on 11/9/12 and received in our plant on 11/12/12. Proofs went out on 11/18/12 and were held for 2 days. The files received required work beyond stated in the specification and delayed sending of the proofs. We requested an extension to 12/6/12 but were not granted all of the additional days. We shipped the complete 12/5/12.

Corrective Action: We have instituted a more in depth pre-flight process to fully document, by page, issues with files for multiple page count projects. We have had numerous projects since this jacket and have validated that the new process is working.

**Jacket 379-269**

Explanation: The files that arrived on 10/18/12 were corrupt. We received new print files on 10/25/12. The proofs went out on 10/29/12 and were received at the Agency on 11/1/12. They were delayed in arriving at the agency due to Hurricane Sandy. The proof were held for 5 days and returned on 11/7/12. I recently requested our Compliance Report on this jacket, and it is still showing a delivery date of 11/14. Kariane Smith granted an extension to November 30th due to the files being corrupt. The original files came in on 10/18/2012 and the new file came in on 10/25/2012. The proofs were not over held. Our bid was submitted according to our schedule at the time the jacket is available for pickup. The extensive delay in receiving the OK to print caused the jacket to conflict with other work that we had accepted. We requested an extension to 12/6/12. We received the modification to extend to 12/6/12 yesterday morning. The job will still be marked late because we were 800 pieces short on the shipment. We produced the shortage and delivered complete on 12/18/12. We worked very closely with Ms. Smith on this project. She has indicated she would happy to speak with you regarding the circumstances surrounding this jacket.

Corrective Action: The shortage was caused by a faulty counter on our binding equipment. We have since replaced the necessary equipment.

**Jacket 525-547**

Explanation: The jacket required 2 bulk shipments and 2 extensive small package shipments to be completed by various dates. The first bulk shipment and the 2 small package shipments were shipped on time. We shipped a partial of the final bulk shipment on time but did not ship complete until 12/3/12.

Corrective Action: We have reviewed the circumstances surrounding the job and found that there was a misunderstanding between our production and shipping personnel as to when the material needed to be shipped. We have instituted communication measures in our production meetings to rectify this issue.

(emphasis in original).

GPO Printing Specialist Janney finalized and dated the Preaward Survey summary sheet for Colonial Press on February 13, 2013. On the same day, the GPO Contracting Officer, Cheryl D. Hall, signed the Preaward Survey for Colonial Press and

included a recommendation of "NO AWARD" to Colonial Press for the 199-S contract.[11] Contracting Officer Hall set forth the rationale in support of her determination in a document titled, "Determination and Findings" (D&F). Pursuant to regulations in the PPR, a contracting officer must explain his or her nonresponsibility determinations for any contracts worth over $100,000.00. See PPR, Chapter I, § 5.6(a).

The D&F, issued as a half page, written statement, stated, in full:

### DETERMINATION AND FINDINGS

Upon the basis of the findings set forth below and in accordance with the provision on the Printing and Procurement Regulations (PPR) I-5.4(b), I hereby make the following administrative determination.

### FINDINGS

Colonial Press submitted the lowest acceptable bid on Program 199-S.

A Contractor Performance History was run on the contractor starting with November up to and including the present date. The totals of the performance history showed the contractor performing on 18[12] orders with 3 being late for a 16.7% delinquency rate.

Of this total, the contractor was late on 3 of 9 orders in the month of November for a 33% delinquency rate.

Despite opportunities to show improvement or to cure the conditions causing their failure to perform in accordance with schedule, we have no evidence that the contractor has taken any actions that would lead us to believe that their performance will improve.

---

[11] On the same day, GPO Contracting Officer Hall signed the Preaward Survey for Fry Communications with a recommendation of "AWARD."

[12] As noted above, the Preaward Survey stated that eighteen orders were completed, between November 2012 and February 2013, with nine deliveries in November 2012, five deliveries in December 2012, three deliveries in January 2013, and one delivery in February 2013. The supporting documentation in the Contractor Performance History, however, described seventeen orders completed from November 2012 to February 2013, with nine deliveries in November 2012, five deliveries in December 2012, two deliveries in January 2013, and one delivery in February 2013. The record does not indicate how Contracting Officer Hall concluded Colonial Press had performed on eighteen orders, rather than on seventeen.

DETERMINATION

Based on the above findings, it is determined that Colonial Press is nonresponsible on Jacket 199-S.

There is no evidence in the administrative record that Contracting Officer Hall referred or considered referring the responsibility determination for Colonial Press to the Small Business Administration (SBA) for review.

In a letter dated February 14, 2013, Contracting Officer Hall wrote to Colonial Press informing plaintiff of her February 13, 2013 determination that Colonial Press was found not responsible with respect to the competition for the 199-S contract. In her letter, Contracting Officer Hall stated that, "[t]his determination was made as a result of an examination of your contract compliance record which indicates an inability to meet our shipping/delivery dates." Contracting Officer Hall urged Colonial Press to reply to her with steps taken to correct the compliance issues, stating that, "failure to correct this performance may result in additional determinations of this nature." On February 20, 2013, the same day that Colonial Press received notice of its nonresponsibility determination for the 199-S contract,[13] Contracting Officer Hall awarded the contract and issued GPO Purchase Order 96813 to the second lowest bidder, Fry Communications, who had zero late deliveries for the relevant time periods.

On February 20, 2013, Mr. Sergua, following up on his February 12, 2013 explanations, informed GPO Printing Specialist Janney that Colonial Press had received a modification to Jacket 374-351 on February 13, 2013, which extended the delivery date and converted that job to an on-time delivery. GPO Printing Specialist Janney responded the next day, stating:

> Because of the weighted critical delivery schedules mandated by Congress, the remaining incidents where Colonial Press was delinquent on contracted deliveries was sufficient evidence to support finding Colonial Press non-responsible for such a high-profile Term Contract for the Medicare Handbooks.

On February 22, 2013, Colonial Press filed a protest with the GAO, alleging that the GPO's determination of Colonial Press' nonresponsibility with respect to the 199-S contract constituted an abuse of discretion.[14] As a result of plaintiff's protest to the

---

[13] Although the contracting officer dated the letter February 14, 2013, it appears that notice to Colonial Press was delayed until February 20, 2013 when GPO Printing Specialist Janney sent a courtesy copy by email to Chris Sergua of Colonial Press.

[14] Plaintiff also appealed a second, adverse responsibility determination by the GPO for another contract under invitation for bids No. 379-975, which involved the printing of a booklet entitled "Two Bite Club" for the United States Department of Agriculture, Food and Nutrition Services. This second protest, B-408055, involved a similar set of facts to

GAO, on February 26, 2013, the GPO issued a stop work order on the 199-S contract to Fry Communications, informing it of the protest filed by Colonial Press. In the GAO protest, Colonial Press argued that the GPO Contracting Officer had considered only the compliance history of Colonial Press, rather than the full range of factors set out in PPR, Chapter 1, § 5.4. Moreover, Colonial Press pointed out that it had a perfect 0% late rating for long-term printing contracts, which plaintiff argued were most similar in kind to those in 199-S contract. As a result, Colonial Press contended at the GAO that "the GPO [sic] should sustain this protest as to the Contracting Officer's non-responsibility determination, cancel the award of Program 199-S to Fry Communications, and award this contract to Colonial Press."

Upon receipt of the bid protest on February 28, 2013, the GAO requested input from the SBA, on the subject of whether the GPO was subject to the requirements of the SBA's Certificate of Competency (SBA/COC) program. Pursuant to the Small Business Act at 15 U.S.C. § 637(b)(7) (Supp. VI 2013), a "Government procurement officer" is required to submit his or her determination of a bidder's nonresponsibility to the SBA for review regarding whether the contractor is eligible for the SBA/COC program in cases in which a low bidder is a small business concern.[15] Id. On March 15, 2013, the SBA responded by letter to the GAO's query regarding the applicability of the SBA/COC program to the GPO. In its letter, the SBA stated that, "[b]ased upon our review of the law in this area we believe the requirements of the COC program could, arguably, apply to GPO and other non-executive agencies."

On March 27, 2013, the GPO submitted an agency report to the GAO. In its agency report, the GPO argued that the bid protest should be denied because the GPO Contracting Officer was not unreasonable when she determined that Colonial Press was nonresponsible for the 199-S contract. The agency report submitted to the GAO stated that, "the contracting officer had a reasonable basis to conclude that the Colonial past performance, especially the performance of Colonial in the last quarter of 2012, caused her to have doubt about the ability of Colonial to meet the stringent, constant, month-to-month demands of Program 199S [sic] for on time high volume production." With respect to the question of whether the GPO was subject to the SBA/COC program, the GPO report stated the "GPO has concluded that nothing in the comments from the SBA changes the well reasoned determination by GAO more than thirty years ago that procurements of GPO are not subject to the Small Business Act."

---

the above captioned case, and was decided simultaneously by the GAO in its May 6, 2013 decision on Colonial Press' protest regarding the award of the 199-S contract.

[15] Colonial Press alleges that it is a small business concern for the purposes of the SBA/COC program because it has less than 500 employees. According to the PPR, the maximum number of employees that a commercial printing business may employ and still qualify as a small business is 500. According to an affidavit in the record submitted by the Chief Executive Officer of Colonial Press, Mr. Jorge Gomez, Colonial Press employs 131 full-time employees. Defendant does not challenge Colonial Press' allegation that it is a small business concern.

On May 6, 2013, the GAO issued a decision denying Colonial Press' bid protests, B-408031 (the Medicare publications), and B-408055 (the Healthy Eating publications). The GAO found that the GPO Contracting Officer had a reasonable basis for her determination of Colonial Press' nonresponsibility. In particular, the GAO found that, "[t]he record here supports the reasonableness of the contracting officer's determination, with respect to Colonial Press' bid under each IFB, that the firm was not responsible because its recent performance on printing contracts had shown an inability to meet delivery requirements." In addition, the GAO found that, "our Office has consistently held that GPO, as a legislative branch agency, is not subject to the SBA/COC referral requirements of the Small Business Act, 15 U.S.C. § 637(b)(7) . . . . Accordingly, the GPO was not required to refer its nonresponsibility determinations of Colonial Press to SBA." (citations omitted).

Thereafter, Colonial Press filed the above-captioned, post-award protest in this court. After an initial conference, Colonial Press submitted an amended complaint. In this court, plaintiff contests the nonresponsibility determination by the GPO Contracting Officer, alleging that the Contracting Officer's decision, "based solely on a compliance record that showed a mere 1.7% late percentage rate on relevant jobs," was arbitrary and capricious, and lacked a rational basis. Colonial Press alleges that the Contracting Officer acted arbitrarily and capriciously by considering only a narrow window of Colonial Press' Contractor Performance History and by ignoring evidence offered by Colonial Press regarding its actions to remediate past late deliveries. Colonial Press also protests the GPO Contracting Officer's failure to refer her nonresponsibility determination to the SBA, which Colonial Press alleges is in a violation of provisions of the Small Business Act.

By way of relief, Colonial Press asks the court to issue an injunction with instructions that the GPO correct the alleged errors in its nonresponsibility determination process and re-evaluate Colonial Press' responsibility determination for the 199-S contract. Colonial Press also seeks an injunction from the court requiring the GPO Contracting Officer to refer any unfavorable responsibility determination to the SBA for further review. In addition, Colonial Press seeks an injunction precluding the GPO from ordering work for Program 199-S publications from Fry Communications. The parties filed cross-motions for judgment on the administrative record and oral argument was held.

**DISCUSSION**

**Jurisdiction**

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (Supp. V

13

2011). Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2013), which governs motions for judgment on the administrative record, the court's inquiry is directed to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010) (citing Bannum, Inc. v. United States, 404 F.3d 1346. 1356-57 (Fed. Cir. 2005)).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2006)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001) (providing a history of the federal courts' jurisdiction over bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.), (citing Scanwell Laboratories, Inc. v. Shaffer for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); Glenn Defense Marine (Asia), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013) ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial. 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)."); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("Congress intended to extend the jurisdiction of the Court of Federal Claims to include post-award bid protest cases brought under the APA by disappointed bidders, such as the plaintiff in Scanwell."), cert. denied, 534 U.S. 1113 (2002). The United States Court of Appeals for the Federal Circuit has stated that the United States Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (quoting 41 U.S.C. § 403(2))); see also Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any

stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2008); <u>RAMCOR Servs. Grp., Inc. v. United States</u>, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2006). The language of 5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706; <u>see</u> <u>also</u> <u>Orion Tech., Inc. v. United States</u>, 704 F.3d 1344, 1347 (Fed. Cir. 2013); <u>COMINT Sys. Corp. v. United States</u>, 700 F.3d 1377, 1381 (Fed. Cir. 2012); <u>Savantage Fin. Servs. Inc., v. United States</u>, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d 1352, 1358 (Fed. Cir. 2009); <u>Axiom Res.</u>

Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting the arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Bannum, Inc. v. United States, 404 F.3d at 1351; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013); see also Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically has addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but the Federal Circuit has focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d at 1363; see also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of Title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds that can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

16

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) The agency must present a full and reasoned explanation of its decision . . . . The reviewing court is thus enabled to perform a meaningful review . . . ."), aff'd on subsequent appeal, 262 F. App'x 275 (Fed. Cir. 2008); Textron, Inc. v. United States, 74 Fed. Cl. at 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 222 F. App'x 996 (Fed. Cir.), and dismissed per stipulation sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court has also cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995-96 (Fed. Cir. 1996); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340; Textron, Inc. v. United States, 74 Fed. Cl. at 285; Labat-Anderson Inc. v. United States, 50 Fed. Cl. 99, 106 (2001); Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 222, aff'd, 264 F.3d 1071 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 619 (2001); Ellsworth Assocs., Inc. v. United States392 (1999), dismissed, 6 F. App'x 867 (Fed. Cir. 2001). The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts;' a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999); C.A.C.I., Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004)).

Furthermore, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

17

<u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. <u>See</u> <u>Statistica, Inc. v. Christopher</u>, 102 F.3d 1577, 1581 (Fed. Cir. 1996); <u>Data Gen. Corp. v. Johnson</u>, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." <u>Data General</u>, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." <u>Statistica</u>, 102 F.3d at 1582.

<u>Alfa Laval Separation, Inc. v. United States</u>, 175 F.3d 1365, 1367 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 1999) (citation omitted in original); <u>see</u> <u>also</u> <u>Allied Tech. Grp., Inc. v. United States</u>, 649 F.3d 1320, 1326 (Fed. Cir.), <u>reh'g en banc denied</u> (Fed. Cir. 2011); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d at 1319; <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332-33; <u>OMV Med., Inc. v. United States</u>, 219 F.3d 1337, 1342 (Fed. Cir. 2000); <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1057; <u>Stratos Mobile Networks USA, LLC v. United States</u>, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. <u>See</u> <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); <u>see</u> <u>also</u> <u>R & W Flammann GmbH v. United States</u>, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing <u>Ray v. Lehman</u>, 55 F.3d 606, 608 (Fed. Cir.), <u>cert. denied</u>, 516 U.S. 916 (1995)). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); <u>see</u> <u>also</u> <u>HP Enter. Servs., LLC v. United States</u>, 104 Fed. Cl. 230, 238 (2012); <u>Vanguard Recovery Assistance v. United States</u>, 101 Fed. Cl. 765, 780 (2011); <u>Seaborn Health Care, Inc. v. United States</u>, 55 Fed. Cl. 520, 523 (2003) (quoting <u>Honeywell, Inc. v. United States</u>, 870 F.2d at 648 (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d at 1301)).

As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider

whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Gulf Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 617 F.2d 590, 598 (Ct. Cl. 1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958-59; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Lockheed Missiles & Space Co. v. United

19

States, 4 F.3d at 958; JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir), reh'g denied (Fed. Cir. 2002); John C. Grimberg Co., v. United States, 185 F.3d at 1303 (citing Trilon Educational Corp. v. United States, 217 Ct. Cl. 266, 270–271, 578 F.2d 1356, 1358, reh'g denied, 1978 WL 14872 (Ct. Cl. Sept. 29, 1978)).

Further, the Federal Circuit has indicated that:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted). Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (alterations added).

PAI Corp. v. United States, 614 F.3d at 1351; see also Glenn Defense Marine (Asia), PTE Ltd. v. United States, 720 F.3d at 907 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332) ("Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'"); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000)))).

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn, Inc. v. United States, 33 Fed. Cl. 677, 682-83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation." (footnote omitted)); see also Textron, Inc. v. United States, 74 Fed. Cl. at 286 (in which the court considered technical ranking decisions as "'minutiae of the procurement process'" not to be second guessed by a court (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))). This is because "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449; see also Unisys Corp. v. United States, 89 Fed. Cl. 126, 142 (2009) (holding that an agency's "exercise of such technical judgment and expertise . . . . is entitled to the

greatest possible deference under E.W. Bliss"); Dismas Charities, Inc. v. United States, 61 Fed. Cl. 191, 203 (2004) ("The decision as to whether an offeror should have scored a 3, 4, or 5 on any question is properly left to the discretion of the agency."). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct. See, e.g., WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) ("Therefore, this court's main task is to ensure that the [agency] examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (internal citations omitted))).

Contracting officers are afforded wide discretion to make responsibility determinations "[b]ecause responsibility decisions are largely a matter of judgment." See John C. Grimberg Co. v. United States, 185 F.3d at 1303 (citing Trilon Educ. Corp. v. United States, 217 Ct. Cl. at 270–271, 578 F.2d at 1358). The court recognizes, therefore, that "'the greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.'" Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (quoting Burroughs Corp. v. United States, 223 Ct. Cl. 53, 64, 617 F.2d 590, 597 (1980)); see also Glenn Defense Marine (Asia), PTE Ltd. v. United States, 720 F.3d at 907-08 (quoting Burroughs Corp. v. United States, 223 Ct. Cl. at 64, 617 F.2d at 617 ("[T]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.")); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1334–35 (recognizing that "Contracting officers are 'generally given wide discretion' in making responsibility determinations"); D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012). Although a contracting officer must have or obtain sufficient evidence to make a responsibility determination, a contracting officer may "properly make a nonresponsibility determination based on the existing record, without giving the contractor an opportunity to explain or defend against adverse evidence." John C. Grimberg Co. v. United States, 185 F.3d at 1303; see id. ("[A]lthough the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so."); see also CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 388-89 (2010) (quoting same).

### Is the GPO Subject to the SBA Program?

Initially, the court considers this court's jurisdiction to review the GPO's nonresponsibility decision.[16] Section 1491(b)(1) states that the United States Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency . . . ." 28 U.S.C. § 1491(b)(1)

---

[16] Regarding the any issue of waiver, at oral argument defendant's counsel stated that, "the Government is not asserting that Colonial Press has waived its opportunity to make its argument."

21

(emphasis added). Federal courts long have held that the GPO is a part of the legislative branch. See United States v. Allison, 91 U.S. 303, 306, 307 (1875) (holding that the superintendent of the public printing officer, a predecessor of the GPO, the "government printing-office," "is not under the control of any one of the executive departments," and "is more responsible to Congress than to any other authority"); see also Mayo v. United States Gov't Printing Office, 9 F.3d 1450, 1451 (9th Cir. 1993); Tatelbaum v. United States, 749 F.2d 729, 730 (Fed. Cir. 1984) (citing Int'l Graphics, Div. of Moore Bus. Forms, Inc. v. United States, 4 Cl. Ct. 186, 197 (1983) (holding that the GPO is not an "executive agency" under the Contract Disputes Act)); McKenzie v. Sawyer, 684 F.2d 62, 68 (D.C. Cir. 1982); Thompson v. Sawyer, 678 F.2d 257, 264 (D.C. Cir. 1982); OTI Am., Inc. v. United States, 73 Fed. Cl. 758, 770 n.26 (2006) (describing the GPO as a "legislative agency"), aff'd, 227 F. App'x 926 (Fed. Cir. 2007); OTI Am., Inc. v. United States, 68 Fed. Cl. 108, 109 n.2 (2005) (calling the GPO "an agency of the legislative branch"); Custom Printing Co. v. United States, 51 Fed. Cl. 729, 733 n.8 (2002) (describing the GPO as "part of the legislative branch"); Abramson v. United States, 40 Fed. Cl. 204, 207 n.3 (1998) (deeming the GPO to be a legislative, not an executive, agency). "[T]he GPO has functioned in practice under the direct supervision of Congress's Joint Committee on Printing." Int'l Graphics, Div. of Moore Bus. Forms, Incl. v. United States, 4 Cl. Ct. 186, 197 (1983). The parties do not dispute the characterization of the GPO as a legislative agency.

Nonetheless, Judges of the United States Court of Federal Claims have repeatedly concluded that this court has jurisdiction to consider bid protests regarding the GPO's determinations. In OTI America, Inc. v. United States, 68 Fed. Cl. 108, although the court indicated that OTI's filing "presented a bid protest that does not fit neatly into either of the two standard categories of such cases, *i.e.,* a pre-award protest of a proposed procurement or a post-award protest of a contractual award," OTI sought "to invoke the jurisdiction of this court to protest a decision by the Government Printing Office ('GPO') to cease making any further orders of samples or product from OTI under a previously issued multi-award contract." Id. at 109. The court wrote, however, "[i]n light of the broad language of Subsection 1491(b) and Congress's expressed intent that the Subsection encompass the entire procurement process, the court holds that it has subject matter jurisdiction to consider OTI's claim." Id. at 117. In a subsequent decision on the merits, the same Judge concluded that the "GPO's actions in eliminating OTI from the competition for full agency deployment of electronic passport book covers was arbitrary and an abuse of discretion," and found that the "GPO materially erred in the procurement." OTI Am., Inc. v. United States, 68 Fed. Cl. 646, 658, 659 (2005). After the protest was sustained, OTI again filed a protest, and the same Judge noted that "[t]his is the second time OTI has been before the court challenging an action by GPO under the matching contracts." OTI Am., Inc. v. United States, 73 Fed. Cl. at 760. The court again concluded it possessed jurisdiction, noting that "the court may set aside an agency contracting decision that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" id. at 767 (quoting 5 U.S.C. § 706(2)(A)), but granted the government's motion for judgment on the administrative record. See id. at 779.

22

In News Printing Co. v. United States, 46 Fed. Cl. 740 (2000), the Court of Federal Claims considered a protest on invitation for bids issued by the GPO for a requirements contract regarding the printing of patents issued by the Patent and Trademark Office. The court concluded that "although the GPO is the contracting entity, the real interested party is the PTO [Patent and Trademark Office]." Id. at 742. In R.R. Donnelley & Sons, Co. v. United States, 40 Fed. Cl. 277 (1998), plaintiff filed suit challenging the GPO cancelation of an invitation for bids related to the printing of patents, and claimed bid preparation and related costs. The court issued a decision on the merits in favor of the government. See id. at 286. In another bid protest, GraphicData, LLC v. United States, 37 Fed. Cl. 771 (1997), the court issued a decision on the merits, after a challenge to the GPO's award of a contract to another bidder. The court found for defendant and the intervenor after plaintiff claimed that the GPO had violated its own regulations and basic principles of fair bidding when it provided the awardee with an electronic file that was not listed in the invitation for bids as government-furnished property. See id. at 773.

Additionally, although not in the bid protest context, in Tatelbaum v. United States, 749 F.2d 729, when reviewing a GPO Board of Contract Appeals decision denying plaintiff's appeal of a GPO contracting officer's decision regarding the GPO's right to a setoff, the United States Court of Appeals for the Federal Circuit concluded that it "lack[ed] jurisdiction to hear this appeal. Accordingly, we transfer the instant appeal to the United States Claims Court, assuming, without deciding, that it has jurisdiction under the Tucker Act. See 28 U.S.C. § 1491 (1982)." Id. at 730. The Federal Circuit stated:

> A prerequisite to this court assuming jurisdiction over an appeal from a decision of a board of contract appeals is that the decision by the board must be pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 607(g)(1) (1982). 28 U.S.C. § 1295(a)(10); North American Corp. v. United States, 706 F.2d 1212 (Fed. Cir. 1983). The Contract Disputes Act only applies to contracts of an "executive agency." 41 U.S.C. § 602. GPO does not fall within the 41 U.S.C. § 601(2) definition of an "executive agency." See International Graphics v. United States, 4 Cl. Ct. 186, 197 (1983). Because GPO is not an "executive agency" within the meaning of the Contract Disputes Act we are without jurisdiction to decide this appeal. Pursuant to 28 U.S.C. § 1631, we transfer this case to the United States Claims Court.

Tatelbaum v. United States, 749 F.2d at 730. After transfer, the Claims Court Judge noted that "Mr. Tatelbaum's complaint invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1491 and the Wunderlich Act, 41 U.S.C. §§ 321-22. Both parties have filed motions for summary judgment." Tatelbaum v. United States, 10 Cl. Ct. 207, 209 (1986). The Claims Court Judge subsequently issued a decision on the merits, granting the defendant's motion for summary judgment. The court concluded that "[t]he GPO Board of Contract Appeals correctly determined that the United States could recover reprocurement costs for contracts terminated for default from an insolvent contractor by

deducting these costs from amounts due the contractor under those unrelated contracts. The Board's decision is not arbitrary, capricious, is supported by substantial evidence, and is correct as a matter of law. Consequently, this Court determines that the Board's decision should be affirmed." Id. at 212-13. Subsequent decisions by this court and its predecessor have agreed that there is no Contract Disputes Act jurisdiction, but there is Tucker Act jurisdiction over the GPO. See MPE Bus. Forms, Inc. v. United States, 44 Fed. Cl. 421, 423-24 (1999) (quoting Fry Commun's, Inc., v. United States, 22 Cl. Ct. 497, 502–03 (1991)) ("'[A] contract with the GPO is not subject to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613. This is so because the CDA applies to contracts entered into by *executive agencies*, 41 U.S.C. § 602(a), whereas here the GPO is not such, but rather is an agency of Congress . . . . Nevertheless, the Claims Court has jurisdiction over this case, inasmuch as plaintiff seeks money damages for breach of an express contract with the United States, under the Tucker Act, 28 U.S.C. § 1491(a)(1).'") (emphasis in original).

In a somewhat related case, Emery Worldwide Airlines, Inc., v. United States, 264 F.3d 1071, the Federal Circuit considered a bid protest case involving the United States Postal Service, which, as the Federal Circuit noted, "is statutorily defined as an 'independent establishment of the executive branch of the United States.' 39 U.S.C. § 201 (1994)." Emery Worldwide Airlines, Inc., v. United States, 264 F.3d at 1080. The United States argued that the Court of Federal Claims did not have jurisdiction because United States Postal Service was not a Federal agency, as the phrase is used in 28 U.S.C. § 1491(b)(1). See Emery Worldwide Airlines, Inc., v. United States, 264 F.3d at 1080. The Federal Circuit explained that:

That section [28 U.S.C. 1491(b)(1)] gives the Court of Federal Claims jurisdiction over actions objecting to proposed or actual contract awards "by a federal agency." While Title 28 of the United States Code does not define "federal agency," it does define "agency:"

As used in this title:. . . . The term *"agency" includes any* department, *independent establishment*, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, *unless context shows that such term was intended to be used in a more limited sense*.

28 U.S.C. § 451 (Supp. V 1999) (emphasis added). Nothing in § 1491(b)(1) indicates that this definition of "agency" does not apply in determining whether a government entity is a "federal agency" under § 451. Further, § 451 dictates that an "agency" for purposes of Title 28 must be within the domain of the United States. Accordingly, "federal agency" as used in 28 U.S.C. § 1491(b)(1) falls within the ambit of "agency" as used in 28 U.S.C. § 451. Consequently, we must consider whether the USPS [United States Postal Service] is an "agency" under § 451.

<u>Emery Worldwide Airlines, Inc., v. United States</u>, 264 F.3d at 1080; <u>see</u> <u>also</u> <u>Hewlett-Packard Co. v. United States</u>, 41 Fed. Cl. 99, 103 (1998).

The Federal Circuit, in <u>Emery</u>, therefore, looked to the definition in 28 U.S.C. § 451 of "agency," to determine how "Federal agency" is defined in 28 U.S.C. § 1491. The definition section relating to the United States Courts provides the following definition of "agency:"

> The term 'agency' includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

28 U.S.C. § 451. Regarding 28 U.S.C. § 451, the Federal Circuit held that: "Neither the statutory text surrounding the word 'context' in 28 U.S.C. § 451 nor the text of any related congressional act clearly indicates that 'agency' was not meant to include the USPS." <u>Emery Worldwide Airlines, Inc., v. United States</u>, 264 F.3d at 1081 (citing <u>Rowland v. Cal. Men's Colony</u>, 506 U.S. 194, 199 (1993)); <u>Office Depot, Inc. v. United States</u>, 95 Fed. Cl. 517, 529 (2010) (finding that the FDIC, as a "'mixed-ownership' Government corporation . . . in which the United States has a proprietary interest," is an agency under 28 U.S.C. § 451 and, thus, a Federal agency under 28 U.S.C. § 1491).

Although in <u>Emery Worldwide Airlines</u> the Federal Circuit did not expressly address whether a legislative agency, like the GPO, meets the definition provided in 28 U.S.C. § 451, in <u>Bell BCI Co. v. United States</u>, 56 Fed. Cl. 465 (2003), a Judge of the Court of Federal Claims indicated that the court may have jurisdiction under the Tucker Act over bid protests against legislative agencies. <u>Id.</u> at 470. In <u>Bell</u>, the court examined its jurisdiction under 28 U.S.C. § 1491(b)(1) and 28 U.S.C. § 451(1) in a case involving the Architect of the Capitol, and found that it had jurisdiction over the action. <u>See</u> <u>Bell BCI Co. v. United States</u>, 56 Fed. Cl. 465 at 470. Although <u>Bell</u> did not explicitly state that the United States Court of Federal Claims had jurisdiction under 28 U.S.C. § 1491 and 28 U.S.C. § 451(1) over legislative agencies, the <u>Bell</u> court did conclude that "[d]efendant has not shown that the Architect of the Capitol is a Legislative Branch agency," the court also held that the defendant had not shown that "if it is, that the Architect would be excluded from this court's jurisdiction." <u>Id.</u>[17] Based on the above discussion, the court finds that the United States Court of Federal Claims has

---

[17] In a case related to <u>Bell</u>, <u>Fru-Con Construction v. United States</u>, 57 Fed. Cl. 483 (2003), the court summarized this aspect of the ruling in <u>Bell</u>, stating, "[w]e ruled in a related case that the Architect of the Capitol is a Federal agency for jurisdictional purposes, and that this court's Tucker Act jurisdiction does not depend on whether the Architect of the Capitol is a part of the Legislative Branch." <u>Id.</u> at 484.

jurisdiction over bid protests brought against GPO contract decisions under 28 U.S.C. § 1491(b)(1).

## Are Responsibility Determinations by the GPO Subject to the SBA/COC Program?

Colonial Press alleges that the GPO Contracting Officer was statutorily required to refer her nonresponsibility determination regarding Colonial Press for the 199-S contract competition to the SBA for possible eligibility in SBA/COC program. The SBA/COC program was established by "An Act to amend the Small Business Act and the Small Business Investment Act of 1958," Pub. L. No. 95-507, 92 Stat. 1757 (October 24, 1978) (codified 15 U.S.C. §§ 631 et seq. (Supp. IV 2010)) (the 1978 Amendments). Colonial Press argues that 15 U.S.C. § 637 should be applied to the GPO, and, therefore, the Contracting Officer should have referred the responsibility determination to the SBA. Colonial Press argues that the plain meaning of the term "Government" in 15 U.S.C. § 637c is apparent, and that the term encompasses all federal departments and agencies, including those in the legislative branch. According to Colonial Press, the term "Government" on its face means the "Government of the United States," including the executive, legislative, and judicial branches. Colonial Press argues that this approach is further supported because "the lack of a definition of 'Government' in the Small Business Act is indicative that 'Government' is being used in its ordinary all-inclusive meaning of 'Government of the United States.'" Colonial Press also argues that because Congress declined to insert the term "Federal agency" in 15 U.S.C. § 637(b)(7), Congress did not narrow the SBA/COC program to the procurements of federal executive branch agencies upon its passage of 15 U.S.C. § 632 in the 1978 Amendments. According to Colonial Press, "even if GPO is excluded from §§ 632(b) and 637c, the scope of § 637(b)(7) is not limited by either section. It is only by the actual language in Section 637(b)(7), and the language in Section 637(b)(7) encompasses all *Government* procurement officers, including those at GPO." (emphasis in original).

The defendant responds that, "[b]ecause GPO is not part of the executive branch, and not a 'Federal agency' as defined in the Small Business Act, GPO is not required to comply with any part of the Small Business Act, including 15 U.S.C. § 637(b)(7)." The defendant also argues that the term "Government" is not as clear as plaintiff suggests. The defendant looks to other sections of the Small Business Act for further guidance on how the term "Government" should be construed. Defendant quotes Gustafson v. Alloyd Co., 513 U.S. 561 (1995) for the proposition that: "'A term should be construed, if possible, to give it a consistent meaning throughout the Act. That principle follows from our duty to construe statutes, not isolated provisions.'" (quoting Gustafson v. Alloyd Co., 513 U.S. at 568). The defendant admits that Congress may make board use of the term "Government" in the Declaration of Policy rationales at the start of the Small Business Act, for example when the Small Business Act states, "[i]t is the declared policy of the Congress that the *Government* should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business

concerns in order to preserve free competitive enterprise . . . ." 15 U.S.C. § 631(a) (Supp. IV 2010) (emphasis in original).

Additionally, defendant points to limited constructions of the terms "Government-wide" in 15 U.S.C. § 644(k)(6) (Supp. VI 2013) (referring to the Federal Acquisition Regulation (FAR) as a "Government-wide" regulation) and the executive's interpretation of 15 U.S.C. § 644(g)(1)(A) (commanding the President to establish "Government-wide" procurement goals) to mean that the President should set up an Office of Federal Procurement Policy (OFPP) with authority over executive agencies. See generally 41 U.S.C. §§ 1101 and 1102 (Supp V. 2011). According to defendant, therefore, a proper reading of 15 U.S.C. § 637(b)(7), within the context of the entire Small Business Act requires only executive agencies to refer nonresponsibility determinations to the SBA. The defendant also argues that the court should give due regard to the line of the GAO decisions starting after the 1978 Amendments, in which the GAO addressed the question of whether the GPO is subject to the Small Business Act, and rejected that notion. Finally, the government argues that the court should interpret 15 U.S.C. § 637(b)(7) in light of thirty years of practical usage by federal agencies, arguing that the GPO has let thousands of printing contracts during the last thirty years without referring any unfavorable responsibility determinations to the SBA.

The statutory provision at issue, 15 U.S.C. § 637(b), provides:

It shall also be the duty of the [Small Business] Administration and it is empowered, whenever it determines such action is necessary . . . .

> (7)(A) To certify to Government procurement officers, and officers engaged in the sale and disposal of Federal property, with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer or an officer engaged in the sale and disposal of Federal property may not, for any reason specified in the preceding sentence preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administration.

15 U.S.C. § 637(b)(7) (emphasis added).

The SBA/COC program is designed "to assist small businesses to obtain a fair share of Federal Government contracts, subcontracts, and property sales," 13 C.F.R. § 125.1 (2013). According to 13 C.F.R. § 125.5, a section of SBA regulations authorized by 15 U.S.C. § 637(b)(7) (Supp. IV 2010), "[t]he COC Program is applicable to all Government procurement actions." 13 C.F.R. § 125.5(a)(1) (2013); see also 48 C.F.R. §

19.601 (2013); PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 546; United Enter. & Assoc. v. United States, 70 Fed. Cl. 1, 10 n.13 (2006). A Certificate of Competency is issued by the SBA with a detailed rationale for its decision that the small business possesses the responsibility necessary to perform the specific government contract. See 13 C.F.R. § 125.5(a) (2013). Relevant portions of 13 C.F.R. § 125.5 state:

> (a)(1) The Certificate of Competency (COC) Program is authorized under section 8(b)(7) of the Small Business Act. A COC is a written instrument issued by SBA to a Government contracting officer, certifying that one or more named small business concerns possess the responsibility to perform a specific Government procurement (or sale) contract. The COC Program is applicable to all Government procurement actions . . . .

> (a)(2) A contracting officer must, upon determining an apparent low small business offeror to be nonresponsible, refer that small business to SBA for a possible COC, even if the next low apparently responsible offeror is also a small business . . . .

> (a)(3) A small business offeror referred to SBA as nonresponsible may apply to SBA for a COC. Where the applicant is a non-manufacturing offeror on a supply contract, the COC applies to the responsibility of the non-manufacturer, not to that of the manufacturer . . . .

> (c)(1) A contracting officer who determines that an apparently successful offeror that has certified itself to be a small business with respect to a specific Government procurement lacks any element of responsibility (including competency, capability, capacity, credit, integrity or tenacity or perseverance) must refer the matter in writing to the SBA Government Contracting Area Office (Area Office) serving the area in which the headquarters of the offeror is located . . . .

> (d)(1) Upon receipt of the contracting officer's referral, the Area Office will inform the concern of the contracting officer's negative responsibility determination, and offer it the opportunity to apply to SBA for a COC by a specified date.

13 C.F.R. § 125.5 (emphasis added).

If a small business concern is deemed nonresponsible by a contracting officer, then it may be eligible for the COC program. See 13 C.F.R. § 125.5(a)(2) For a contract between $100,000.00 and $25,000,000.00, like the one at issue in the above-captioned protest, an SBA Area Director has discretion under 13 C.F.R. § 125.5(g) to approve (subject to right of appeal or other options[18]) or deny the eligibility of the

---

[18] Subsection i of 13 C.F.R. § 125.5 states in part, "[f]or COC actions with a value exceeding $100,000, contracting agencies may appeal a Director's decision to issue a

contractor for a Certificate of Competency.  See 13 C.F.R. § 125.5(g). The contracting officer may appeal the SBA Area Director's approval of a small-business concern for SBA/COC eligibility, with the SBA, but the SBA Director's decision can supplant the determination by the contracting officer that the contractor is nonresponsible.

> Section 125.5(m) states that
>
> a COC is conclusive as to responsibility.  Where SBA issues a COC on behalf of a small business with respect to a particular contract, contracting officers are required to award the contract without requiring the firm to meet any other requirement with respect to responsibility.

13 C.F.R. § 125.5(m).   Under § 125.5(o), the SBA continues to monitor any small business concern that is awarded a contract due to its COC eligibility.

On March 15, 2013, the SBA responded by letter to the GAO's query regarding the applicability of the SBA/COC program to the GPO.   In its letter, indicated that, "[b]ased upon our review of the law in this area [the SBA/COC program] we believe the requirements of the COC program could, arguably, apply to GPO and other non-executive agencies."  The SBA noted that 15 U.S.C. § 632(b) defines an "agency" and a "Federal agency" pursuant to 5 U.S.C. § 551(1), which does not encompass Congress or its agencies and instrumentalities.  See 15 U.S.C. § 632(b) (Supp. IV 2010); see also 5 U.S.C. § 551(1).   The SBA also indicated, however, that 15 U.S.C. § 637(b)(7)(A) uses the term "Government procurement officer," rather than the terms "agency" or "Federal agency," to authorize the COC program.  As a result, the SBA stated:

> SBA believes the rule of application established by 15 U.S.C. § 632(b) and 5 U.S.C. § 551(1) and the line of cases interpreting those provisions is of arguable significance in the case of the COC program.  While those cases can provide persuasive precedent, SBA does not believe they serve as binding authority with regard to the issue of whether GPO must comply with 15 U.S.C. § 637(b)(7)(A).

The SBA concluded that that it was, therefore, "an open question" whether or not the requirements of the SBA/COC program were applicable to a legislative agency like the GPO.[19]  As noted by the SBA, two sections, 15 U.S.C. § 632(b), and 15 U.S.C. § 637c, of the 1978 Amendments provide definitions.  Section 632 provides:

---

COC to SBA Headquarters by filing an appeal with the Area Office processing the COC application."  13 C.F.R. § 125.5(i).

[19]  Although Colonial Press argues that the SBA's letter may be an indication of a willingness to change its position on the question of whether the SBA/COC program applies, the letter alone is not a sufficient ground for the court to find 15 U.S.C. § 637(b)(7) applies to the GPO.  Moreover, Colonial Press raised this issue before the GAO.  The GAO decision concluded that, "the SBA does not assert that it has changed its position . . . . Neither the SBA's statement, nor the protestor's related argument, has

(b) "Agency" defined

For purposes of this chapter,[20] any reference to an agency or department of the United States, and the term "Federal agency," [sic] shall have the meaning given the term "agency" by section 551(1) of Title 5, but does not include the United States Postal Service or the Government Accountability Office.

15 U.S.C. § 632(b).  A GAO decision in Fry Communications Inc., 62 Comp. Gen. 164, 166 (1983), refers to the legislative history of Section 632(b), in which a Senate Report, Senate Committee on Governmental Affairs in the Senate Report 95-1140, issued August 24, 1978, noted that: The Committee definition of 'agency' excludes the United States Postal Service, the General Accounting Office, and agencies in the legislative and judicial branches." S. Rep. No. 95-1140, at 4, 1978 U.S.C.C.A.N. 3866 (1978).

---

persuaded our Office to reverse our longstanding view on the question."  Colonial Press Int'l, Inc., B-408031, B-408055, 2013 CPD ¶ 119, 2013 WL 1898787 (Comp. Gen. May 6, 2013).

[20] The Statute at Large, 92 Stat. 1772, P.L. 95-507, section 224(b) (October 24, 1978), and the United States Code, 15 U.S.C. § 632 are somewhat different.  In 92 Stat. 1772, section 224 contains the following subsection:

(b) For purposes of this Act, any reference to an agency or department of the United States, and the term 'Federal agency', [sic] shall have the meaning given the term 'agency' by section 551(1) of title 5, United States Code, but does not include the United States Postal Service or the General Accounting Office.

P.L. 95-507, 92 Stat. 1772 (emphasis added).  The Statute at Large and the Code appear to differ on whether the definitions provided in section 224(b) of the Statute at Large, 92 Stat. 1772 apply to the 1978 Amendments or to the entire Chapter 14A.  As noted in the "References in Text" following 15 U.S.C. § 632, "[t]his chapter, referred to in text, was in the original 'this Act,' meaning the Small Business Act, Pub. L. 85-536, July 18, 1958, 72 Stat. 384, as amended, which is classified principally to this chapter."  The United States Supreme Court has indicated that, when United States Code and a Statute at Large differ, the Statute at Large controls.  See U.S. Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 448 (1993) ("Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws.'"); Stephan v. United States, 319 U.S. 423, 426 (1943) (per curiam); Cheney R.R. Co., Inc. v. R.R. Retirement Bd., 50 F.3d 1071, 1076 (D.C. Cir. 1995); Five Flags Pipe Line Co. v. Dep't of Transp., 854 F.2d 1438, 1440 (D.C. Cir. 1988).

The section at 15 U.S.C. § 637c states in full:

> For purposes of this Act[21]—
>
> (1) the term "Administrator" means the Administrator of the Small Business Administration;
>
> (2) the term "Federal agency" has the meaning given the term "agency" by section 551(1) of Title 5, but does not include the United States Postal Service or the Government Accountability Office; and
>
> (3) the term "Government procurement contract" means any contract for the procurement of any goods or services by any Federal agency.

15 U.S.C. § 637c (2006). Section 637 does not define or provide any other guidance on the scope of the term "Government procurement officer." Both 15 U.S.C. § 632b and 15 U.S.C. § 637c first appear in the 1978 Amendments, by which Congress amended the Small Business Act in order to create additional procurement opportunities for socially and economically disadvantaged groups, "by providing the maximum practicable opportunity for the development of small business concerns owned by members of socially and economically disadvantaged groups." Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978). Congress broadly uses the term "Government" within provisions of the 1978 Amendments, but then limits the definition of "Government procurement contract" in a definitional section to "a contract for the procurement of any goods or services by any <u>Federal agency</u>." 15 U.S.C. § 637c (emphasis added).

As noted above, the SBA also referred to the definition of "Federal agency" in 5 U.S.C. § 551(1). The statute at 5 U.S.C. § 551 states, in part:

> For the purposes of this subchapter—
>
> (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--
>
> > (A) the Congress;
> >
> > (B) the courts of the United States;
> >
> > (C) the governments of the territories or possessions of the United States;

---

[21] According to the "References in text" section following 15 U.S.C. § 637c in the United States Code, "[t]his Act, referred to in text, means Pub. L. 95-507 Oct. 24, 1978, 92 Stat. 1757," i.e., the 1978 Amendments.

(D) the government of the District of Columbia; or except as to the requirements of section 552 of this title--

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; . . .

5 U.S.C. § 551(1) (Supp. V 2011). In a brief opinion in Mayo v. United States Government Printing Office, the United States Court of Appeals for the Ninth Circuit concluded that: "Just as the Act [5 U.S.C. § 551(1)] in excluding 'the courts of the United States,' 5 U.S.C. § 551(1)(B), excludes not only the courts themselves but the entire judicial branch, so the entire legislative branch has been exempted [from the definition of 'agency']." Mayo v. United States Government Printing Office, 9 F.3d at 1451 (citing Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 145 (1980), in which the United States Supreme Court interpreted Section 551(1)(A) with respect to a provision of the Freedom of Information Act, and held that the Library of Congress, as a legislative entity and a subunit of "the Congress," was not an agency under section 551(1) for the purpose of the Freedom of Information Act).

In analyzing whether the SBA/COC program covers the GPO, the court finds that the term "Government" at 15 U.S.C. § 637(b)(7) is ambiguous, and undefined throughout the Small Business Act. Section 632 does not define "Government procurement officer" or "Government procurement contract," however, it does provide a definition of "Federal agency" as "any reference to an agency or department of the United States." See 15 U.S.C. § 632(b). Section 637c defines the term "Government procurement contract" as "any contract for the procurement of any goods or services by any Federal agency." 15 U.S.C. § 637c(3). It is unreasonable to interpret "Government procurement contracts" to exclude contracts solicited by legislative agencies on the one hand, but to interpret "Government procurement officers" to include contracting officers of those same legislative agencies. See Gustafson v. Alloyd Co., 513 U.S. at 570 ("'[I]dentical words used in different parts of the same act are intended to have the same meaning'" (quoting Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994))). Upon promulgating the 1978 Amendments, Congress limited the definitions in 15 U.S.C. § 637c to the 1978 Amendments, rather than to the entire Small Business

Act.  Therefore, it appears that Congress purposefully limited the scope of 15 U.S.C. § 637c "for this Act."[22]

Section 637(a)(1) provides:

It shall be the duty of the Administration and it is hereby empowered, whenever it determines such action is necessary or appropriate-- . . . to enter into contracts with <u>the United States Government and any department, agency, or officer thereof having procurement powers</u> obligating the Administration to furnish articles, equipment, supplies, services, or materials to the Government or to perform construction work for the Government.  In any case in which the Administration certifies to <u>any officer of the Government having procurement powers</u> that the Administration is competent and responsible to perform any specific Government procurement contract to be let by any such officer, <u>such officer</u> shall be authorized in his discretion to let such procurement contract to the Administration upon such terms and conditions as may be agreed upon between the Administration and <u>the procurement officer</u>.

15 U.S.C. § 637(a)(1)(A) (emphasis added).  Section 637(a)(1), therefore, defines a "procurement officer" as an officer  of a department or agency "having procurement powers."  <u>See</u> <u>id.</u>  Section 637(a)(1)(A) refers to an "officer thereof" with reference to an "agency" or "department" of the "United States Government."  The section also explains that the SBA may enter into contracts with a "department, agency, or officer thereof having procurement powers" and provides that "any officer of the Government having procurement powers," who is later referred to as a "procurement officer," may contract with the Small Business Administration in his or her discretion.  <u>See</u> <u>id.</u>  The reference to "procurement officer" in 15 U.S.C. § 637(a)(1)(A), therefore, is tied to the reference to an officer of a department or agency having procurement powers, which pursuant to the definition of "agency" located at 15 U.S.C. § 632, does not include legislative agencies.  <u>See</u> 15 U.S.C. § 632(b) (citing 5 U.S.C. § 551(1)); <u>see</u> <u>also</u> <u>Mayo v. Gov't Printing Office</u>, 9 F.3d at 1451.  Because 15 U.S.C. §  637(a)(1)(A) defines "procurement officer" as an officer of a department or agency of the United States Government having procurement powers, the court applies the same definition to the reference to "Government procurement officers" that appears in section 637(b)(7)(A).

Although not determinative, the court also gives consideration to how the GAO has interpreted 15 U.S.C. § 637 over the past thirty years.  <u>See</u>, <u>e.g.</u>, <u>Kingdomware Techs., Inc. v. United States,</u> 107 Fed. Cl. 226, 230 n.2 (2012) ("GAO decisions are not binding authority, but may be 'instructive in the area of bid protests.'" (quoting <u>Centech Grp., Inc. v. United States</u>, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009))); <u>Grunley Walsh Int'l, LLC v. United States</u>, 78 Fed. Cl. 35, 39 (2007) ("Decisions by the GAO are traditionally treated with a high degree of deference, especially in bid protest actions."

---

[22] At oral argument plaintiff's counsel conceded that 15 U.S.C. § 637c was limited to executive agencies.

(citing <u>E.W. Bliss Co. v. United States</u>, 33 Fed. Cl. 123, 135 (1995), <u>aff'd</u>, 77 F.3d 445 (Fed. Cir. 1996))); <u>Univ. Research Co., LLC v. United States</u>, 65 Fed. Cl. 500, 503 (2005) (citing as examples <u>Overstreet Elec. Co. v. United States</u>, 47 Fed. Cl. 728, 733 n.7 (2000) and <u>CACI Field Servs. v. United States</u>, 13 Cl. Ct. 718, 731 n.28 (1987), <u>aff'd</u>, 854 F.2d 464 (Fed. Cir. 1988)).

The government also cites the following language from the United States Supreme Court in <u>Udall v. Tallman</u>, 380 U.S. 1, <u>reh'g</u> <u>denied</u>, 385 U.S. 989 (1965):

> "It may be argued that while these facts and rulings prove a usage, they do not establish its validity. But government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any longcontinued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself,--even when the validity of the practice is the subject of investigation."

<u>Id.</u> at 17 (quoting <u>United States v. Midwest Oil Co.</u>, 236 U.S. 459, 472-73 (1915)).

Regarding the solicitation at issue in the protest currently before the court, the GAO cited four past GAO decisions:

> [O]ur Office has consistently held that GPO, as a legislative branch agency, is not subject to the COC referral requirements of the Small Business Act, 15 U.S.C. § 637(b)(7) (2006 & Supp. V 2011). <u>Downtown Legal Copies</u>, B-289432 [2002 WL 15935], Jan. 7, 2002, 2002 CPD ¶ 16 at 4; <u>Shepard Printing</u>, B-260362 <u>et al.</u> [1995 WL 340995], June 6, 1995, 95-2 CPD ¶ 119 at 3 n.2; <u>Computer Support Sys., Inc.</u>, B-261166 [1995 WL 424639], July 18, 1995, 95-2 CPD ¶ 30 at 2 n.2; <u>Fry Commc'ns, Inc.</u>, B-207605 [1983 WL 26163], Feb. 1, 1983, 83-1 CPD ¶ 109 at 2-5.

<u>Colonial Press Int'l, Inc.</u>, B-408031, B-408055, 2013 CPD ¶ 119, 2013 WL 1898787, at *2. The decision of <u>Fry Communications, Inc.</u>, 62 Comp. Gen. 164, cited by the GAO in its opinion on the GAO protest for the award of the 199-S contract, most fully explains GAO's conclusion that the GPO need not refer a nonresponsibility decision to the SBA for consideration as part of the SBA/COC program. In <u>Fry Communications</u>, the GAO determined that, "[t]he legislative history of the Small Business Act indicates that Congress did not intend to include any legislative or judicial branch agency within the coverage of the Small Business Act. GPO, of course, is an agency within the legislative branch." <u>Fry Commc'ns., Inc.</u>, 62 Comp. Gen. at 166. As a result, the GAO concluded that a GPO contracting officer, who had found a small business concern to be nonresponsible, did not need to refer its determination to the Small Business Administration for review under its SBA/COC program. <u>See id.</u>; <u>see also Evans</u>

34

<u>Security Solutions, Inc.</u>, B-311035, 2008 CPD P 58, 2008 WL 746861 (Comp. Gen. Mar. 19, 2008).

Therefore, although Colonial Press' argument regarding "Federal agency" as it relates to 15 U.S.C. § 637(b)(7) and the SBA/COC program is creative, and may even reflect a positive policy argument and suggestion for the future, the court finds that the statutory text of the Small Business Act, as it has been uniformly interpreted by the GAO, and the GPO, these past many years, weighs in favor of not mandating application of the SBA/COC program found in section 637(b)(7) to the GPO. Although Colonial Press argues that the SBA's letter may be an indication of uncertainty regarding whether the SBA/COC program applies, the letter alone is not a sufficient ground for the court to find that 15 U.S.C. § 637(b)(7) applies to the GPO. Therefore, the Contracting Officer did not violate the SBA/COC program referral requirements of 15 U.S.C. § 637(b)(7) by not referring the GPO decision regarding plaintiff's nonresponsibility determination on the 199-S competition to the SBA.

### The GPO Nonresponsibility Determination

Colonial Press argues that the D&F signed by the GPO Contracting Officer, which found Colonial Press nonresponsible for the purposes of the 199-S contract, lacked a rational basis. Colonial Press alleges that the Contracting Officer arbitrarily and capriciously "artificially narrow[ed]" the relevant time period under consideration for the responsibility determination, and did not consider all the available relevant evidence of Colonial Press' performance history, in order to arrive at a higher percentage for Colonial Press' late deliveries, "in order to make a "misleading claim," and to "manipulate" the statistics "to create a desired effect."[23] Defendant responds that the

---

[23] Colonial Press, however, does not allege that the GPO Contracting Officer acted in bad faith. Even if Colonial Press were to argue that the GPO Contracting Officer acted in bad faith, the court notes that the high burden necessary to prevail on an allegation of bad faith. See <u>Am-Pro Protective Agency, Inc. v. United States</u>, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). A recent Federal Circuit opinion addressed the standard for bad faith stating:

> The presumption that government officials act in good faith is enshrined in our jurisprudence. <u>Am-Pro Protective Agency, Inc. v. United States</u>, 281 F.3d 1234, 1239 (Fed. Cir. 2002). Government officials are presumed to "act 'conscientiously in the discharge of their duties.'" <u>Kalvar Corp., Inc. v. United States</u>, 543 F.2d 1298, 1301 (Ct. Cl. 1976) (quoting <u>Librach v. United States</u>, 147 Ct. Cl. 605, 612 (1959)). Courts have always been "loath to find to the contrary," and to induce a court to abandon the presumption of good faith dealing, "requires 'well-nigh irrefragable proof.'" <u>Id.</u> at 1301-02 (quoting <u>Knotts v. United States</u>, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954)). Thus, [the protestor] must offer clear and convincing evidence that the Forest Service did not act in good faith in

Contracting Officer's determination had a rational basis, and that the GPO Contracting Officer considered, but ultimately, and reasonably, rejected, the additional responsive evidence offered by plaintiff on its past performance.

In accordance with the PPR, a D&F is a prerequisite to a nonresponsibility determination. See PPR, Chapter 1, § 3.5(a) ("A D&F must stand alone on its own merits and should ideally be confined to a single page, containing all available findings, concisely stated, to support the determination."). The minimum standards for a contracting officer's determination of responsibility are set out in PPR, Chapter 1, § 5.4. Particularly relevant from among the seven minimum standards listed is subsection (c): "have a satisfactory record of performance in regard to both quality and timeliness on previously awarded contracts." Id. § 5.4.

The Contracting Officer offered a very abbreviated, written explanation of plaintiff's performance in her D&F as the basis of her determination that Colonial Press was not responsible for the 199-S competition, referring to the criteria set out in Chapter 1, § 5.4 of the PPR. In the second paragraph of her D&F, the Contracting Officer described plaintiff's late delivery performance percentages over the prior four months. In the next paragraph, she described the percentages of late deliveries for November 2012. As reflected in the D&F, over the entire thirteen-month period of the Contractor Performance History, Colonial Press' late delivery record was just under 6%. Over the four months prior to the date of the solicitation for bids for the 199-S contract, Colonial Press' late delivery record was 16.7% with three out of eighteen deliveries late.[24] All three of the late deliveries occurred in November 2012, a month in which Colonial Press' late delivery record was 33%. Colonial Press argues that in the GPO Contracting Officer's D&F, she arbitrarily narrowed her review of Colonial Press' performance to the last few months, and did not take into account Colonial Press' broader record over the entire thirteen-month time frame as provided in the Contractor Performance History. Colonial Press points to the Contracting Officer's emphasis in her D&F on Colonial Press' November 2012 performance as unreasonable, given that Colonial Press' percentage of late deliveries during November was much higher than Colonial's Press' percentage of late deliveries over the prior thirteen months.

Colonial Press also argues that the GPO Contracting Officer ignored evidence provided by plaintiff that Colonial Press had taken steps to improve its ability for on-time deliveries. Colonial Press states that, "there is nothing in the record that shows any analysis of this evidence, or what justifications there were for not seriously considering this evidence." According to Colonial Press, "[i]t was arbitrary and capricious for the Contracting Officer to dismiss this evidence as she did," because reviewing the

order to prevail on this issue. Am-Pro Protective Agency, 281 F.3d at 1239-40.

Croman Corp. v. United States, 724 F.3d at 1364.

[24] As noted above, there is an inconsistency in the number of deliveries by Colonial Press between November 2012 and February 2013.

information would have established that Colonial Press had zero late deliveries over the thirteen-month period on long-term contracts, which Colonial Press contends are most similar to the 199-S contract.

Defendant responds that it was rational for the Contracting Officer to emphasize the most recent late deliveries, arguing that "recent past performance is a better indicator of Colonial's current capabilities and responsibility than Colonial's performance, good and bad, in the more distant past." Defendant further argues that the language in the Contracting Officer's D&F does not suggest that she ignored the information provided by Colonial Press. Instead, defendant argues, "in her Determination and Findings, the contracting officer indicated that the information Colonial submitted simply did not convince her that Colonial's performance would improve. In other words, Colonial failed to affirmatively establish its responsibility and the contracting officer did not have a clear indication that Colonial would be able to meet the proposed delivery schedule."

In a March 26, 2013 affidavit submitted in response to the GAO protest, the Contracting Officer cited both Colonial Press' delivery performance in November 2012, and the prior four-month period, as evidence of a troubling increase in late deliveries regarding Colonial Press' recent performance, when compared with Colonial Press' slightly less than 6% late delivery record over the prior thirteen months. In particular, the GPO Contracting Officer stated in her affidavit to the GAO:

> At the time I made my decision I was aware of the excuses and explanations offered by Colonial for some of the late performances in 2012 however none of this altered my concern about the sudden frequency of late deliveries . . . . This significant decline in recent performance caused me to have no confidence Colonial could meet the stringent constant month-to-month demands of Program 199S for on time high volume production.

Although the affidavit was an ex post facto attempt to explain the GPO Contracting Officer's reasoning when she issued her D&F, it became a part of the administrative record at the GAO, and now the administrative record before this court. The Contracting Officer's later statement to the GAO, quoted directly above, however, stands in stark contrast to her contemporaneous written statement in the D&F that "we have no evidence that the contractor has taken any actions that would lead us to believe their performance will improve."

After considering the record before it, the GAO denied the protest and indicated that, "the contracting officer reasonably considered multiple late deliveries in relatively recent GPO contracts for printing, and concluded that Colonial Press's explanations left doubt as to whether the firm had the capability to fulfill the delivery requirements of the contracts under consideration." The GAO also noted that, "[a]lthough Colonial Press argues that it successfully delivered on time on other GPO contracts, this does not render the contracting officer's judgment that late deliveries on 16 percent (three out of

37

18) of its contracts represented an unsatisfactory record of recent performance. Also, while Colonial Press argues that each of the late deliveries was distinguishable from the work required under these IFBs--and that Colonial Press was not at fault--the firm does not dispute that each delivery was late." (footnotes omitted). The GAO concluded: "Those facts provide a reasonable basis for the contracting officer's nonresponsibility determination."

In light of the February 12, 2013 letter written by Mr. Sergua of Colonial Press to the GPO regarding plaintiff's efforts to correct, or explain plaintiff's previous late deliveries, it is odd that the Contracting Officer, just one day later, on February 13, 2013, stated in the D&F, that "[d]espite opportunities to show improvement or to cure the conditions causing their failure to perform in accordance with schedule, we have no evidence that the contractor has taken any actions that would lead us to believe their performance will improve." The Contracting Officer's letter on February 14, 2013 also is unusual in that, despite Mr. Sergua's email response to the GPO, which offered explanations for the late deliveries, the Contracting Officer's letter to Mr. Sergua on February 14, 2013 informing Colonial Press of her nonresponsibility determination in regard to the 199-S contract, again requested that Colonial Press respond to Ms. Hall "documenting the steps you [Colonial Press] are taking to correct this compliance problem, since failure to correct this performance may result in additional determinations of this nature," without making any reference to Colonial Press's detailed explanations for the late deliveries. As noted above, in her affidavit submitted in response to the GAO protest, the Contracting Officer wrote: "At the time I made my decision I was aware of the excuses and explanations offered by Colonial for some of the late performances in 2012 however none of this altered my concern about the sudden frequency of late deliveries . . . ." As also noted above, however, a contracting officer need not give a contractor "an opportunity to explain or defend against adverse evidence." John C. Grimberg Co. v. United States, 185 F.3d at 1303. Moreover, once explanations are offered, a contracting officer still can exercise his or her discretion to consider, reject, or accept the explanations offered.

The relevant PPR requires that "[a] D&F must stand alone on its own merits and should ideally be confined to a single page, containing all available findings, concisely stated, to support the determination." PPR Chapter 1, § 3.5(a). Although it may be quicker, as well as more convenient, for the GPO and its personnel to draft a one page document, and, thereby, not reveal too much about the agency's decision process, the suggestion that a D&F ideally should be confined to a single page, while insisting that the D&F must stand alone on its own merits, is inconsistent and does a disservice to the offerors, and those reviewing the D&F. The lack of transparency is troubling. Coupled with the broad discretion afforded the decision-maker, a regulatory directive as "ideally" requiring such a minimalistic defense of an award decision is especially disturbing. The "ideal" goal of keeping a D&F to "a single page," most often will result in an overly abbreviated articulation of why a contractor was not found responsible, as was the case regarding Colonial Press, making it more difficult for any reviewer, including the GAO and this court, to develop an understanding of the Contracting Officer's reasoning. Whether this directive to ideally create only a one page D&F was intended to encourage

38

succinct writing, or allow a contracting officer to hide behind the brevity and make review of the decision more difficult, is not entirely clear. The effect in this case, however, leaves the court frustrated with the relative dearth of information about the decision. Transparency in government and in the procurement process is an important aspect of government procurement which does not seems to be promoted by the PPR.

The court is concerned about the extreme brevity and summary nature of the Contracting Officer's D&F, albeit in conformance with the PPR, as well as about the Contracting Officer's statement that: "Despite opportunities to show improvement or to cure the conditions causing their failure to perform in accordance with schedule, we have no evidence that the contractor has taken any actions that would lead us to believe their performance will improve," in light of Mr. Sergua's submitted explanations. Despite the above, however, given the broad discretion afforded a contracting officer's decision regarding a responsibility determination, the court finds that the Contracting Officer's D&F provided a defensible explanation of her decision to find Colonial Press nonresponsible. It was not arbitrary or capricious for the Contracting Officer to weigh heavily in her decision the increase in Colonial Press' late deliveries during more recent months before the prospective award at issue. The Contracting Officer was entitled to find that the late deliveries in November were troublesome enough, notwithstanding the explanations, so that she should be cautious about awarding the 199-S contract to Colonial Press, particularly in light of the importance to HHS of the Medicare publications and the more perfect performance history of Colonial Press' competitor, Fry Communications. The court should not substitute its judgment for that of the contracting officer or the agency. As noted by the United States Supreme Court: "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43; see also Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d at 1376; Honeywell, Inc. v. United States, 870 F.2d at 648; BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 508 (2013) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755 (2004) ("The court 'is not empowered to substitute its judgment for that of the agency.'"); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. at 238; Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 780. Accordingly, the nonresponsibility determination made by the GPO Contracting Officer, although minimally documented and presented in summary fashion, was based on legitimate concerns and will not be disturbed by this court.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the administrative record is **DENIED**. Defendant's cross-motion for judgment on the administrative record is **GRANTED**. The Clerk of Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**